REPORTER'S RECORD

TRIAL COURT CAUSE NO. 2024-72783

| | | |
|---|---|---|
| LLOYD & MOUSILLI, PLLC | ) | IN THE DISTRICT COURT |
| VS. | ) | |
| LEMA MOUSILLI, TEXAS NEXUS LAW GROUP, AND JP MORGAN CHASE BANK, N.A., | ) | OF HARRIS COUNTY, TEXAS |
| VS. | ) | |
| FERAS MOUSILLI | ) | 295TH JUDICIAL DISTRICT |

------------------------------

TESTIMONY OF ELIZABETH REVERE

------------------------------

On the 31st day of March, 2026, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Donna Roth, Judge presiding, held in Houston, Harris County, Texas;

Proceedings reported by machine shorthand.

EXHIBIT

B

A P P E A R A N C E S

FOR FERAS MOUSILLI:

Ms. Maureen Farrell
State Bar No.
Farrell Legal Group, PC
3411 Richmond Avenue, Suite 400
Houston, Texas 77046
Tel: 210.693.1011

FOR LEMA MOUSILLI:

Mr. Lloyd E. Kelley
State Bar No. 11203180
The Kelley Law Firm
2726 Bissonnet, Suite 240 PMB 12
Houston, Texas 77005
Tel: 281.492.7766

INDEX

TESTIMONY OF ELIZABETH REVERE


| March 31, 2026 | | | PAGE |
|---|---|---|---|
| DEFENDANTS' WITNESSES: | | | |
| | DIRECT | CROSS | |
| Elizabeth Revere | 4, 51 | 15, 52 | |
| Court Reporter's Certificate.................. | | | 55 |

P R O C E E D I N G S

ELIZABETH REVERE,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. FARRELL:

03:36PM Q. Can you hear me and see me okay?
03:36PM A. I can.
03:36PM Q. All right. Do you know this lady here?
03:36PM A. Yes.
03:36PM Q. And who is this lady?
03:36PM A. Lema Mousilli.
03:36PM Q. And do you know her brother?
03:37PM A. I do.
03:37PM Q. And what's his name?
03:37PM A. Feras Mousilli.
03:37PM Q. And how do you know them?
03:37PM A. I used to work with them.
03:37PM Q. At where?
03:37PM A. At Lloyd & Mousilli.
03:37PM Q. And when we say "where," did you work in a -- 03:37PM does Lloyd & Mousilli have an office that you went to 03:37PM every day?
03:37PM A. No. I worked remotely.
03:37PM Q. Where do you live?
03:37PM A. I live in the Sixth Ward.

03:37PM Q. Okay. In Houston?
03:37PM A. Uh-huh.
03:37PM Q. Are you an attorney?
03:37PM A. I am.
03:37PM Q. How long have you been an attorney?
03:37PM A. I'm going on 35 years.
03:37PM Q. Have you always practiced in Texas?
03:37PM A. Also, Louisiana.
03:37PM Q. What kind of law do you practice?
03:37PM A. General civil practice.
03:37PM Q. Litigation?
03:37PM A. Litigation.
03:37PM Q. All litigation or some transactions?
03:37PM A. Some transactions, but more litigation. And employment-type, human resources-type stuff that isn't necessarily litigation.
03:37PM Q. Do you still do work for Lloyd & Mousilli?
03:37PM A. Not at this point.
03:38PM Q. Okay. When did you first -- well, who did you meet first? Did you meet Feras or did you meet Lema?
03:38PM A. Lema.
03:38PM Q. Okay. Do you remember when you met her?
03:38PM A. I met her on a phone call. I -- I don't -- it was in April of 2021, I believe.
03:38PM Q. Okay. Did another attorney introduce you to

03:38PM Lema?
03:38PM A. Yes. Camille Calvert.
03:38PM Q. Okay. So can you just tell -- tell us about that initial conversation and how you came to work for Lloyd & Mousilli.
03:38PM THE COURT: Initial conversation with Ms. Calvert? Or the initial conversation with Ms. Mousilli?
03:38PM Q. (BY MS. FARRELL) Can you tell us how you came to work for Lloyd & Mousilli?
03:38PM A. Sure. My friend Camille texted me --
03:38PM MR. KELLEY: Objection, Your Honor, hearsay.
03:38PM THE COURT: My friend Camille texted me.
03:38PM MR. KELLEY: That's a communication.
03:38PM THE COURT: You know you can't say what Camille texted you, correct?
03:38PM THE WITNESS: Yes. Yes.
03:39PM And then I gave -- I sent my information to Lloyd & Mousilli. I don't remember if I sent it directly to Lema or if I might have also sent it to Megan Weiss, it's been a while. But after, you know, that's -- that's how it came about.
03:39PM Q. (BY MS. FARRELL) Did you sign a contract with Lloyd & Mousilli, PLLC?

A. I did.
Q. Do you remember what the -- what that contract was called? Did it have a title?
A. I don't remember what it was called.
Q. Were you an independent contractor for Lloyd & Mousilli?
A. Yes, I was.
Q. Okay. And what is your recollection of who made a hiring decision to hire you?
A. My understanding --
MR. KELLEY: Objection, Your Honor. That's going to call for some kind of hearsay, if it's "my understanding."
THE COURT: I'm sorry. Reask your question or tell me what your question was.
MS. FARRELL: Who hired you? Who made the decision?
THE COURT: Okay. Well, you can answer that question. Who hired you?
THE WITNESS: The offer came from Megan Weiss.
Q. (BY MS. FARRELL) Do you know who made the decision to hire you?
A. Feras made the decision.
Q. Okay. Did you work primarily with Feras or

with Lema?

A. Lema.

Q. Okay.

A. Lema.

Q. How long did you work with Lema?

A. I'd say around three years, around. Two to three years. Two to three. I don't remember. At one point I stopped working with Lema and did mainly transactional work for the firm and litigation related to trademarks, administrative proceedings. So I -- I just don't happen to remember when that was, whether it was three years in, or two-and-a-half that I stopped working directly with Lema.

Q. Did you go to court or were you just a briefing attorney for Lema?

A. Initially, I did some going to court. I ultimately withdrew to just being a briefing attorney.

Q. And were you briefing issues for Lema's cases or for --

A. Lema's cases.

Q. Okay. How were you paid for your hours? Can you explain to the jury how you were paid for your work at Lloyd & Mousilli?

A. As I did my work, I would enter into it a timekeeping system. There had been at least two

separate timekeeping systems. And then by the end of the month, the firm would get the hours that I put in, and it would go through an approval process, and that went initially to Lema and then to Feras to approve the time. And then a month later, I was paid.

Q. Were you happy with that process?

A. Not really. Not really.

Q. Was there a time where you felt that there was a discrepancy between the hours that you had worked and what you were being paid?

A. Oh, that definitely happened.

Q. Okay. And when that happened who did you bring those complaints to?

A. I initially brought them to Lema.

Q. Was she able to resolve those concerns?

A. She was not able to resolve those concerns.

Q. Did she -- did you have a conversation with Lema about why she couldn't resolve those concerns?

A. Yes.

Q. Do you recall that conversation?

A. I do.

Q. Do you recall a specific instance where you had that conversation?

A. Yes. I remember a specific phone call that I was out of the office at a class and I had to leave the

03:42PM class to take the phone call when she was calling me
03:42PM about it, so...
03:42PM Q. Okay. And do you recall what she told you?
03:42PM A. She told me that there was nothing she could do
03:43PM about it, that she wasn't in charge, it was Feras's
03:43PM decision, which surprised me greatly because she had
03:43PM told me she was the litigation partner. And she was
03:43PM very clear that she was a contractor just like I was and
03:43PM that the decision was not hers and it had been made by
03:43PM Feras. It was entirely out of her hands as to whether I
03:43PM would be paid for that time.
03:43PM Q. Did you subsequently follow up with Feras to
03:43PM resolve those discrepancies?
03:43PM A. Yes, through Megan Weiss.
03:43PM Q. Were they ultimately resolved?
03:43PM A. Well, not to my satisfaction. But, yes.
03:43PM Q. So was it your -- when did you -- you said at
03:43PM some point you stopped working with Lema; is that
03:43PM correct?
03:43PM A. Yes.
03:43PM Q. Okay. And how -- how much longer did you stay
03:43PM at the firm -- or were you at the firm when Lema
03:44PM departed?
03:44PM A. I was.
03:44PM Q. Okay. Are you familiar with the reasons for

her departure?
A. Yes.
Q. From your personal knowledge?
A. I didn't speak to Lema about it, but I spoke to Feras and Megan about it, and they approached me and asked me if I would --
MR. KELLEY: Objection, Your Honor, hearsay.
THE COURT: It's sustained. "They approached me and asked me." Sustained.
THE WITNESS: Okay. All right. Well, Feras approached me, and -- and asked if I would --
MR. KELLEY: Sorry. That -- it was sustained.
THE COURT: It's sustained. Ask a different question.
MS. FARRELL: She can talk about what Feras said to her, Your Honor.
MR. KELLEY: No.
THE COURT: Okay. I'm sorry. Did I hear your question? Did you rephrase your question? And if so, repeat it for me.
MS. FARRELL: I did not rephrase it, but let me ask a different question.
Q. (BY MS. FARRELL) Do you -- do you know why

Ms. Mousilli left the firm?

MR. KELLEY: Objection, Your Honor. If she's going to -- again, hearsay. If that's the source of it, I'm going to object to it.

THE COURT: Okay. So the answer to this question is simply "yes" or "no." Does she know.

MR. KELLEY: Personal knowledge or hearsay.

THE COURT: That may be the next question. But if she knows, the answer is "yes" or "no."

MR. KELLEY: Thank you.

THE COURT: You may answer that question.

THE WITNESS: I do know why she left.

Q. (BY MS. FARRELL) Okay. Do you know from your personal knowledge or just from what you've heard from other people?

A. I know from discussions with Feras.

Q. Okay.

MR. KELLEY: Objection, hearsay.

THE WITNESS: I did not discuss it with Lema.

Q. (BY MS. FARRELL) Okay. Did you observe Lema's interactions with other members of staff on occasion?

A. Certainly.

Q. Have you ever heard her yelling at staff?

A. Yes.

Q. Was that a frequent -- a frequent event?
A. It happened on occasion that I was a witness to. It happened on occasion.
Q. Okay. When -- who else did you work with? Was there support staff that you worked specifically with?
A. We had several litigation paralegals and Alana -- her last name is leaving me, but Alana. And originally there was a lady named Vicki who was there, but she left. And then we had Kiara. We had Maureen.
Q. That's me.
A. Marlene.
Q. Marlene.
A. Yes, it is you. Sorry about that. Yeah.
THE COURT: Can we just giggle for a minute? Thank you.
Q. (BY MS. FARRELL) Did you firsthand witness Lema's interactions with staff regarding this -- this video or after she left because of the video?
A. No.
Q. Okay. Other than the time -- so your recollection was that she said that she was a contractor like you?
A. Yes.
Q. Okay.
MR. KELLEY: Objection to the leading.

THE COURT: Okay. I know you're talking to me, but you're not standing up.

MR. KELLEY: I'm sorry. I'm getting lazy.

THE COURT: Yeah. Especially if we're going to talk about court decorum.

MR. KELLEY: Yes, ma'am. You got me. You got me. That's improper. I apologize to you.

THE COURT: Okay. So what was your objection?

MR. KELLEY: Leading.

THE COURT: Okay. It's sustained.

Q. (BY MS. FARRELL) Did you have the impression that Lema had -- had a right to make decisions about the management of the firm?

A. No.

Q. Who had the -- who -- from your experience --

A. I think I misspoke. Yes, I had an impression. The impression was no.

Q. Why is that?

THE COURT: She is just answering the very specific question you asked. She's trying to be correct.

THE WITNESS: Yes, yes. But my impression was no.

Q. (BY MS. FARRELL) And did you have the

impression that Feras was the one that was able to make -- who did you think was the person with the authority to make decisions about management in the firm?

A. Feras.

MS. FARRELL: Pass the witness.

THE COURT: Would you like to cross-examine the witness?

MR. KELLEY: May I, Your Honor?

THE COURT: Of course.

MR. KELLEY: Thank you.

THE COURT: You're welcome.

CROSS-EXAMINATION

BY MR. KELLEY:

Q. I was trying to find your name. Revere, right?

A. Yes.

Q. Do you want me to call you Ms. Elizabeth Revere or Beth?

A. Beth's fine.

Q. Okay. All right. And, Ms. Revere, Feras was the kind of person that would make all decisions if he's around, right?

A. He's still that kind of person.

Q. Yeah. He's very, very, I'm in control, it's mine, it's -- we're going to do it my way. Always the

03:48PM one to boss everyone, right?
03:49PM A. I don't know that I would characterize it that way when it was his firm and his decision.
03:49PM Q. Well, you don't have personal knowledge of the creation of the firm, right?
03:49PM A. I'm sorry?
03:49PM Q. You didn't -- you weren't there when they created the firm?
03:49PM A. I was not.
03:49PM Q. Do you know the firm's structure?
03:49PM A. I know a little bit about the firm's structure.
03:49PM Q. Who owns Lloyd & Mousilli, PLLC?
03:49PM A. An entity that is partially -- partially owned by Feras and partially owned by another entity, I believe.
03:49PM Q. Okay. So the members of the PLLC are nonlawyers to your knowledge; is that true?
03:49PM A. To the extent that an entity can't be a lawyer, but my understanding is there's a lawyer behind all of it.
03:49PM Q. Oh. I asked you: The members of the PLLC are nonlawyers, to your knowledge?
03:49PM A. Correct.
03:49PM Q. Did you ever discuss that with Feras, that this entity has a nonlawyer who is an incorporation or a

corporation?
A. No.
Q. Okay. Did you -- were you aware that at one time it was an LLC, not a PLLC?
A. I don't remember whether I was aware of that.
Q. Do you remember where the name "Lloyd" came from?
A. Yes.
Q. That was his earliest partner, right?
MS. FARRELL: Objection, leading.
MR. KELLEY: I'm on cross, Judge.
THE COURT: Overruled.
THE WITNESS: My understanding is that he was someone that Feras went to law school with. I don't know that he ever actively participated in the firm.
Q. (BY MR. KELLEY) So you don't know?
A. I don't know.
Q. You don't know what the arrangement Feras had with Jason Lloyd, do you?
A. I don't.
Q. Did you ever talk to Jason Lloyd?
A. I was in a meeting he was at, but I don't think we spoke.
Q. What meeting was this?
A. I thought we were on a video meeting, one of

03:50PM the original all-hands that he appeared at.
03:51PM Q. So Jason Lloyd to your knowledge appeared at an all-hands meeting when you were there as an independent contractor?
03:51PM A. I think so. I may be wrong, but I think so.
03:51PM Q. Did he speak up?
03:51PM A. I just don't remember much about it.
03:51PM Q. What was this all-hands meeting? What -- I'm not asking about that specific one, but when you said all-hands meeting, what are you talking about?
03:51PM A. When everybody who works with the firm, we get on a video call together for several hours.
03:51PM Q. Okay. Did this happen frequently? Monthly?
03:51PM A. A couple times a year.
03:51PM Q. Once a year.
03:51PM A. A couple times a year.
03:51PM Q. A couple times a year. Okay. Thank you.
03:51PM And this would be an important meeting for the firm?
03:51PM A. I believe that the firm considered them important.
03:51PM Q. Okay. And this was so that everybody in the firm would come together and they'd have whatever the great man Mr. Feras wanted to let everybody know about. It was -- was it just a social meeting? Was this a

business meeting?
A. It was a business meeting.
Q. Yeah. And one of these meetings you -- you think Jason Lloyd was there and even participated, but you just can't remember what that was; is that accurate?
A. I feel like he was at a meeting. I could be wrong, but I think I remember that.
Q. Your time frame was -- you started when?
A. I started in April of 2021.
Q. And you ended?
A. Probably about a month ago I did my last work, probably.
Q. You've been there since 2026?
A. No. Since 2021. Almost five years. Almost five years.
Q. What month did you leave?
A. Well, I think I finished my last work about a month ago.
Q. I don't understand that. What do you mean your last month? You said you left but you still did things?
A. I had -- I was finishing a couple of cases. And I think I did that in the last month, month-and-a-half.
Q. So recently, like this month? March of 2026?
A. It would have been, I believe, the way the pay

03:52PM scale, January, January or early February was the last.
03:53PM Q. 2026?
03:53PM A. Yes.
03:53PM Q. Okay. Okay. So you've been at Lloyd & Mousilli working directly for Feras the whole time this lawsuit has been going on, right?
03:53PM A. I have.
03:53PM Q. And you took over the litigation side of it, right?
03:53PM A. Correct.
03:53PM Q. But they didn't call you litigation partner, did they?
03:53PM A. No.
03:53PM Q. What was your title?
03:53PM A. Senior attorney.
03:53PM Q. Senior attorney.
03:53PM Did your pay increase when you got this additional responsibility as senior attorney?
03:53PM A. Slightly.
03:53PM Q. Slightly.
03:53PM A. Yeah.
03:53PM Q. What was the split? What I -- we had an e-mail earlier about your deal, and it looked like you got about 60 percent of your billables.
03:53PM Is that about right? 65 percent?

A. No.
Q. What was your percentage?
A. I believe -- I'm not 100 percent sure of how I was billed out to clients.
Q. Why is that? You're senior litigation attorney. I mean, right?
A. Well, I wasn't -- I'm not -- I was not -- am not and was not involved with the financial side of the firm. I'm still an independent contractor.
Q. But you got a contract. Doesn't it tell you how the split, how much you're going to be billed out at and how much you're going to get?
A. No, it did not.
Q. Where did you come to that agreement?
A. It changed during the time that I was there.
Q. Was that in writing that you agreed to the change?
A. Probably we agreed over Slack messages.
Q. I didn't ask that.
You had a written contract. Did you amend that contract --
A. No, no, no.
Q. -- or supplement the contract --
A. No.
Q. -- was there something between you and --

03:54PM A. No.
03:54PM Q. -- I guess it would be Feras?
03:54PM A. The writing would have been in a Slack message.
03:54PM Q. Okay. But that's just you and Feras talking on a -- like, a chat. And you're saying, look, I'm going to change my compensation and it's going to go up. And you said, hey, that's great.
03:54PM But that's not an amendment to your contract.
03:54PM A. No, no. My contract was never amended.
03:54PM Q. What does your contract say you were supposed to get?
03:54PM A. It didn't have a rate, I don't think.
03:54PM Q. So where did you get this idea that you were supposed to get any part of the rate that you billed? This was just another Slack message between you and --
03:55PM A. I -- I didn't have an understanding that I got a specific percentage.
03:55PM I'm sorry. Go ahead. I'm sorry.
03:55PM Q. No, no. Get your water, please.
03:55PM I'm getting confused. I thought you called Lema because you didn't get what you thought you were owed.
03:55PM A. Well, I called her because -- that is correct. And here is why that's correct.

Q. No.
A. Here's why that's correct.
Q. No. Let me ask my question.
A. Okay.
Q. I got my "yes."
A. Yeah.
Q. Because I'd like to ask my question.
A. Okay.
Q. And my question is: What did you think was the calculation of what you should have been owed? Did you have a mathematical calculation of what you thought you should have been owed before you decided, oh, I'm not getting what I'm owed?
A. I had a billable rate --
Q. Okay. What was that?
A. -- to the firm. And I had a billable rate to clients. I do not remember what my billable rate was at the time of that phone call.
Q. I'm sorry. You didn't know what your rate was to who? Billable rate to the firm?
A. And then I had a billable rate to clients.
Q. Okay. You don't know either of those rates?
A. I don't remember them. That was years ago. I just don't remember.
Q. I understand.

But you remember this conversation and you remembered you were shorted.
A. I was shorted on hours.
Q. How much money had they shorted you?
A. I don't remember.
Q. A ballpark?
A. I don't remember.
Q. Thousands of dollars or --
A. I would think it was several thousand dollars at least.
Q. You would think?
But you said it didn't get resolved with Lema.
A. No, because she couldn't.
Q. Okay. She just referred you over to Feras, right?
A. Yes.
Q. And Feras resolved it immediately, right? No. That's not --
A. To his satisfaction certainly.
Q. To his satisfaction.
A. Not to mine.
Q. Okay.
A. But yes.
Q. And it never got resolved to your satisfaction,

right?
A. No. My satisfaction would have been that I had been paid for the hours I worked.
Q. And you didn't get paid for the hours you worked?
A. Correct.
Q. And basically the answer back to Feras is, tough, you're not going to get paid what you believe you are owed?
A. That's not what he said.
Q. Okay. Did you get paid the hours that you thought you were owed?
A. I did not.
Q. Did you complain about that?
A. I did.
Q. And to this day, have you ever been paid what you thought you were owed from that incident?
A. No.
Q. Okay. So it didn't get resolved to your satisfaction?
A. Correct.
Q. Did you establish proof, like lawyers do, that you're owed this amount to anybody in that firm? Did you ever show, look, this is the billables? Did you have proof?

A. I submitted my hours, yes, I did.
Q. So you had this document that showed your hours --
A. Correct.
Q. -- right?
And I assume that when you made your case, you pointed to that document?
A. Correct.
Q. But you -- despite having what we call receipts, young people call them receipts or evidence, you were never paid by the firm for those hours.
Is that your testimony?
A. That is.
Q. Okay. And to your testimony today, that was a significant amount? Or otherwise, you wouldn't have been complaining about it.
A. It was to me, yes.
Q. Yeah.
A. Yes.
Q. Maybe, to all of us.
But you also -- did you also have what you called an origination agreement?
A. No. My understanding of originations, it was not -- I don't believe it was in my contract. I haven't looked at my contract in a while.

03:58PM Q. No, no, no. I'm talking about a separate document.
03:58PM A. No, I didn't have one of those.
03:58PM Q. Okay. Did you ever bring clients to the firm?
03:58PM A. I did.
03:58PM Q. And you're the senior -- you took over Lema's spot, you took that position, and you brought clients and you're telling us you never had an agreement to get some percentage of that?
03:58PM A. I didn't bring any clients when I took over the litigation division. Prior to that, I had brought clients to the firm. But I did not as litigation head.
03:59PM Q. But no agreement to share the fees on that origination?
03:59PM A. Not a written, signed agreement.
03:59PM Q. Okay. Did they ever do it verbally, oral?
03:59PM A. Yes.
03:59PM Q. They just said, okay, we're going to pay you this. What was your agreement?
03:59PM A. That I was supposed to get some percentage of origination fees. And since I didn't bring anybody, I just -- I don't remember that percentage.
03:59PM Q. But I thought you said you did eventually bring some clients.
03:59PM A. Originally, I brought clients.

Q. Okay. Did you get a piece of those? Any percentage?
A. No.
Q. And you don't remember the verbal agreement that they told you, if you bring people, you'll get that; is that right?
A. That's correct.
Q. Do you know if anybody that was working with you in the litigation section had any such verbal agreements that they would get origination fees?
A. I believe everyone had that. I simply did not get any originations.
Q. But I'm looking for oral agreements as opposed to written.
A. Yes.
Q. Do you think they all had oral agreements on that same basis?
A. I don't have any way of knowing whether theirs were --
MS. FARRELL: Objection, calls for speculation.
THE WITNESS: -- written or oral.
THE COURT: Ask a different question.
MR. KELLEY: Yes, ma'am.
Q. (BY MR. KELLEY) Do you know if the percentage

was standard across the board? Or did everybody have something different?

A. I don't know.

Q. Okay. But you never talked to Feras about it, this origination fee thing?

A. I am sure I talked to Feras about it at some point.

Q. Okay. What did y'all discuss?

A. I don't remember the substance of the discussion, but I am sure we discussed it.

Q. And it's your testimony that Megan hired you?

A. She gave me the offer that came from Feras.

Q. She transmitted it from Feras?

A. Yes.

Q. And he didn't send you the e-mail himself? Feras didn't send you the letter or the e-mail that said --

A. I don't think so.

Q. -- you're hired?

A. I don't think. I could be wrong, but I don't think so.

Q. Okay. Is that the way the practice was, Megan would generally send out the letters saying you'd been hired or --

A. I'm the only person that I know how she hired

them, so...

Q. Did you have a separation agreement?

A. No.

Q. Did you leave under some written agreement that says, okay, you're leaving, this is how we're going to exit and this is how you're going to get paid?

A. No.

Q. All right. Do you still do work for the firm?

A. I haven't.

Q. Okay. Are you still available and ready to do work for the firm?

A. No.

Q. Have you severed your ties with Lloyd & Mousilli?

A. Yes.

Q. Why? Was it your decision?

A. It was.

Q. Why?

A. It was a fee dispute.

Q. Another fee dispute?

A. Yes.

Q. This month?

A. What?

Q. When did you have this fee dispute?

A. It started last September.

Q. Started last September.

Was it a significant amount or insignificant amount?

A. To me, it's a significant amount.

Q. Let me back up. You have to file documents in courts. We do fee applications all the time that tell us what our fees that we're publicizing to the court, did you ever do those? A fee affidavit where you had to tell what your hourly rate was?

A. Yes.

Q. What rate were you putting in sworn affidavits in courts that your rate was for the firm? Was it $235 an hour? $400 an hour? $700 an hour?

THE COURT: Now? Then? When?

MR. KELLEY: Any time she was at Lloyd & Mousilli.

THE COURT: Okay.

MR. KELLEY: That's a two-year --

THE COURT: So ever through that period.

MR. KELLEY: I don't want your ones before you got to Lloyd & Mousilli. Limit to --

THE COURT: So the question, then, before that is: Did you ever file a fee affidavit while you were at Lloyd & Mousilli?

THE WITNESS: Yes.

Q. (BY MR. KELLEY) And what rate --
THE COURT: You can answer his question.
MR. KELLEY: Thank you, Judge.
THE WITNESS: I believe $495.
Q. (BY MR. KELLEY) Okay. 495.
Did you get a percent of that?
A. I got $200 of whatever my external billing rate was.
Q. So you do know the differences. That would have been the two spread, right? Unless you changed your hourly rate over time in the firm. Let me ask you that.
A. It changed over time at the firm. I'm sorry, I thought I said that.
Q. No, I didn't -- I know you said it earlier that it changed over time, but I didn't know if it was before you put these fee affidavits together.
A. There are likely fee affidavits that I filled out that were at a lower rate. I believe the most recent one that I did was at $495.
Q. That's fair. I appreciate that information. So the most recent one is at 495.
And you're getting basically $200 an hour of that, right?
A. Yes.

Q. Now, I've got a video, and I don't know if my folks here can play it. Are you ready?

You were on some commercials for the business, right?

A. I know I was on at least one.

Q. And then you also did an impromptu -- I don't know what you call it -- a montage of people telling everybody how great Lema and Feras are for -- for building this company.

Do you remember that?

A. I do.

Q. Have you seen it lately?

A. No.

Q. When's the last time you saw it?

A. I don't think I've seen it since I made it.

THE COURT: While you set that up, we're going to go ahead and take a short afternoon break. 10 minutes and we'll be back.

(A break was taken)

(Jury present)

MR. KELLEY: Your Honor, I need to approach.

THE COURT: Okay. Briefly.

(On-the-record discussion at the bench as follows:)

MR. KELLEY: Your Honor, I -- I just want -- I accidentally spoke to the witness as she was passing me. She said I didn't remember her. And I said, oh, and I engaged in a short conversation that she remembered me as controller, because then I remembered she worked for the city attorney's office. I apologize, I didn't stop myself because she said "You don't remember me," and it was my fault. I should not have talked to her, but...

THE COURT: Okay.

THE WITNESS: It was my fault. I shouldn't have mentioned it.

THE COURT: But you didn't talk anything about the case?

THE WITNESS: No, no, no. We just worked together at the city.

MR. KELLEY: No. I realized -- I stopped the conversation.

MS. FARRELL: It's fine.

THE COURT: Okay. All right. Thank you for bringing it to our attention.

(Open Court)

MR. KELLEY: May I?

THE COURT: Yes.

Ms. Revere, I will remind you that you are

still under oath.

THE WITNESS: Yes, ma'am.

Q. (BY MR. KELLEY) Ms. Revere, it's just dawned on me that we probably knew each other 30 years ago. You were a city attorney and I was city controller.

A. Correct.

Q. So I do remember you and I apologize for not recognizing you earlier.

But back then when we all worked, we had physical offices to go to, right?

A. Yes, we did.

Q. I'm getting curious, because you were hired, but you never met these people; is that right? When you were hired, you only see them on, like, Facebook -- I mean, Zoom, FaceTime?

A. Correct.

Q. And you even commented on that, I think, in the video that we're going to watch, you know, you're telling them great things, but you never met them in person. Is that pretty true?

A. If I said that on the video, then it was true at the time.

Q. Yeah. I'll show it to you, I'm not trying to get you to take my word for anything.

A. Okay.

Q. I'm just trying to set the stage.

MR. KELLEY: I want to show her so she can refresh her memory. No trick questions.

And I don't have any sound.

Q. (BY MR. KELLEY) Do you remember this picture, Ms. Revere?

A. Yes.

Q. Okay. The question -- the reason I'm asking is: Was this an office that you regularly went to every day to work from?

A. No. This was a shared work space, I believe that -- that we did a meeting at.

Q. So it was hired out to do just this meeting and take this picture?

A. Well, I think we had a membership there, so other meetings took place there.

Q. That you could go there and just use it monthly. But y'all didn't have actual normal offices like a normal law firm or the city attorney's office where you go there every day and you work, correct?

A. No, it was remote.

Q. And I'm curious then --

MR. KELLEY: You tell me when you've got it ready.

Q. (BY MR. KELLEY) That's you in that video,

right?

A. That was, yes.

Q. Yeah. And that was an impromptu, I think, video?

A. Yes.

Q. The jury has heard it, you just haven't. I won't ask you any substantive questions, but I think the jury has heard that you said "for people that I have never met in person."

If you take that to be my accurate representation, that would have been about true, right? At that time, you had never actually met Feras or Lema or anybody in person?

A. Well, I certainly met Lema first in person. I just don't remember when that was relative to that video.

Q. So my question is: I'm used to being in law firms where people yell. But they're in close proximity. I don't know how you yell remotely. So kind of help me with that.

How would this yelling and sort of stuff happen that you described that Ms. Maureen Farrell had asked you about?

A. Well, if you're on a phone call, a group phone call or a group video call.

Q. Or a text message? I guess you yell by typing in all caps?

A. I guess that's what they say. I -- yeah.

Q. Okay. So it would have been something on the phone call, but it's not you're in somebody's office and -- you didn't hear that, where somebody is screaming at somebody in the office?

A. No, no. Huh-uh.

Q. Yeah. Some of these -- anyway, so who was your city attorney when you were there? Was that Ben?

A. I was there with Ben Hall and Gene Locke.

Q. Those were pretty calm guys. Probably no yelling with them.

But have you ever worked in a law firm where there's some yelling going on? Deadlines, court said this, or we're in trouble?

A. I've worked in courtrooms where there was some yelling going on, so -- when I was a district attorney.

Q. We could talk about judges all day long, couldn't we? We wouldn't. We would never do that.

I want to -- I want to kind of go to the end of the time that Ms. Mousilli was leaving. If I could go to that with you in time frame. And in that time frame, did an issue come up about appearing for clients in cases, active litigation, where Ms. Mousilli

had been previously the lead lawyer, but now Feras said he wanted you to enter appearances in?

A. Yes, yes.

Q. Were there some mistakes made at that time?

A. I believe that there were.

Q. Okay. So -- but was there a little effort by Feras to try to make sure that the firm put their name on these cases?

A. My understanding was that there was a case split and there had been an agreement. And we were just signing on to the ones that it was mutually agreed. And then apparently that agreement wasn't as solid.

Q. But there was never a list of the clients. So like you're coming in, what we would like to have is, oh, these are the clients that are going to be for Lema and these are going to be the clients for Lloyd & Mousilli and everybody would know it. No such list was ever generated to your knowledge, right?

A. Well, I had a list of cases that were still with the firm.

Q. No, I knew that, but that was generated by Mr. Feras, right?

A. I don't --

Q. You were never given a case list that these cases are going to go with Ms. Lema, correct?

A. Yes.
Q. You had a list?
A. There was a list of who was staying and who was going.
Q. Who generated that list?
A. I don't know.
Q. Okay. But --
A. But my understanding was, it was based on the conversation in -- in the departure from the firm.
Q. But you were not part of that conversation?
A. I was not.
Q. Whatever list came to you was not something that you had gotten from Ms. Lema Mousilli, right? You got it from Feras?
A. I did get lists from her at some point, I did.
Q. Later. When there was a little bit of a dispute.
A. Yes.
Q. Let me just cut to the chase. Lema got a little excited or angry or upset with you at making an appearance in some cases, right?
A. Sure. Yeah.
Q. And she took a -- a -- an action of seeking sanctions against you, right?
A. Well, she filed a motion and I responded. And

she refused to set it for hearing. So it's just out there.

Q. I know. But nothing ever happened on it?

A. Because I couldn't set it for hearing.

Q. But you also just filed a motion to withdraw on some cases, right? Sort of a cure. You said, "Look, my bad, I'm out."

A. Certainly.

Q. And --

A. Yeah.

Q. The reason I'm showing you that is Exhibit 12, 84 through 88, Exhibit 12.

MS. FARRELL: Your Exhibit 12?

MR. KELLEY: What's it called? Motion to withdraw as Counsel.

MS. FARRELL: Oh.

Q. (BY MR. KELLEY) The reason I want to go through this is because I think you responded to -- as a motion to withdraw.

MR. KELLEY: And may I approach the witness, Your Honor?

THE COURT: Yes. But this is not in evidence.

MR. KELLEY: I know. I'm going to lay my foundation.

THE COURT: Okay.
Q. (BY MR. KELLEY) Is this a document that you're familiar with, Ms. Revere, Number 12?
A. I don't see the exhibit.
Q. No. I took them off on purpose, because I don't really want all of the extraneous information. What I want to get to is a signature page in a minute. I just want to know if that's the motion that you filed.
Is that your signature?
A. It's my conformed signature.
Q. What does that mean? Somebody electronically signed it?
A. Yes.
Q. I got to interpret this stuff for our jury sometimes. Sometimes I understand it, sometimes I don't.
MR. KELLEY: Okay. So I don't really want the whole document, Judge, I just want her signature. May I change up the document?
THE COURT: Can I see that, please?
THE WITNESS: Yes, ma'am.
THE COURT: Thank you.
Ms. Farrell, is there an objection to this?
MS. FARRELL: There's an objection to it partially. If we're going to put it in, put the whole

thing in.

MR. KELLEY: Okay. Then that's fine. I just didn't want to fight.

THE COURT: Do you have an objection to Plaintiff's Exhibit 12?

MS. FARRELL: No.

THE COURT: Okay. Plaintiff's 12 will be admitted into evidence.

(Plaintiff's Exhibit 12 admitted)

MR. KELLEY: Thank you.

Q. (BY MR. KELLEY) I wanted to bring us up to the departure date.

Now, who instructed you or who approved you filing this document on August 20th of 2024? Mr. Feras Mousilli?

A. Well, certainly, he knew I was filing it.

Q. But you wouldn't have done anything at this time frame on your own, would you?

THE COURT: Mr. Kelley, hold on for a minute. Let us just test the video to make sure that we can play it if it...

MR. KELLEY: Thank you. Let's watch a little movie. It's very short.

(Video played)

Q. (BY MR. KELLEY) Do you remember this video?

A. I remember that I recorded it.
Q. Was that pretty accurate, that you had never met them?
A. I -- I think that was probably very soon after I joined, if I was -- it may have even been the summer all-hands time, right after I started working with the firm. So I was very new.
Q. But you -- you were thanking them for the work they had done with you and that building the firm and stuff like that. So you must have been there a while. You were talking about a great working environment.
A. I love working at home. It's a great working environment for me.
Q. Okay.
A. Yeah. I love that.
Q. I'm with you.
A. I love it.
Q. But working at home, nobody breathing down you, no senior management coming over and telling you you've got a deadline, you've got to stay past 6:00. All that stuff. It's much better, right?
A. I like it.
Q. Yeah. But then in August of 2024, you were asked by Feras to step up to take over the role of heading the litigation department, right?

A. Correct.
Q. And you filed this motion in this particular case, and we're not interested in the case, but you filed it as the motion was brought by Elizabeth Revere and the law firm of Lloyd & Mousilli, PLLC.
Do you remember that?
A. Yes.
Q. And that's because the signature block is -- just so you know I'm not -- I'm reading the date right off of your certificate of service, and that's always a good indication. This tells us this is a federal case in the Southern District of Texas, right?
A. Yes.
Q. And tells us that you filed this on or about August 20th of 2024, right?
A. Yes.
Q. That dates it.
This is what you called your conformed or electronic signature?
A. Correct.
Q. So it's all done on the computer. And then it says that it's being made for -- you have the notice to the client, right?
A. Yes.
Q. That's required. That you have to tell them.

If defendants do not oppose the withdrawal of Elizabeth Revere and the law firm of Lloyd & Mousilli, PLLC, right?
A. Yes.
Q. And that the movants, being Lloyd & Mousilli and Elizabeth Revere, are asking the Court to grant this request to get off the case.
A. Correct.
Q. And what you put in here was -- I'm going to come back to this page, but you put in there that there was some confusion and you give a chronology. And you had actually -- there had been some miscommunications, but you didn't do this intentionally by appearing on cases where the client may not have authorized you. It was just a hurry and you thought you were authorized, right?
A. Correct.
Q. Yeah.
A. Yeah.
Q. And then you -- on page 2, you said, "On June 7, 2024, Lema Mousilli, the then litigation partner at Lloyd & Mousilli," had done all of these things in this case, right?
A. Yes.
Q. And that's the way that -- the entire time you

were there, Ms. Mousilli was referred to as the litigation partner, right?
A. Yes. It was on the website and that's what people called her.
Q. That's what her brother called her, right? In the all-hands meetings and in the videos that we have seen?
A. Yes.
Q. That's the way Feras Mousilli referred to Ms. Lema Mousilli, as the litigation partner, right?
A. Yes.
Q. All right. And then -- yeah, here's your confusion, you talk about the confusion. And you had made some attempts to try to talk to her, her legal assistant tried to talk to you, so you wanted to fix the problem and get off.
But this is -- this is my question: At this time, where was Feras? Was he in town?
A. I don't know. I don't remember.
Q. He's almost always out of the country, right?
A. He travels frequently.
Q. Yeah. And then you just have Lloyd & Mousilli with its address on Westheimer, right, 1105 Westheimer? That's a post office box, right?
A. I think it is. I've never been there.

Q. You've never even been to this place, but it's a PMB, which means it's a post office --
A. Okay. Then, yes.
Q. Okay. And then you put your address -- no, you put the same thing, the PMB, right?
A. Uh-huh.
Q. And then it's you, it's Lloyd & Mousilli and you and no other lawyer.
A. That's correct.
Q. That's what you put on there?
A. Right.
Q. Is that how Feras Mousilli instructed you to do this?
A. Feras did not instruct me to do this.
Q. Who put this signature block together so that Lloyd & Mousilli, PLLC is appearing as a lawyer for --
A. I don't know who designed the firm's signature block.
Q. That's what I meant. I'm sorry. You put it better than I did.
A. Okay.
Q. This was something given to you and you were just using what had been authorized by the firm for you to use on these types of documents; is that fair?
A. In all honesty, I really relied on the

paralegals and I didn't do much checking of signature blocks. And I -- I'm sure I've made mistakes a time or two because of that, but...

Q. But this is not a mistake, this was something -- this was a document, you work on the substance, you send it to the paralegal, and tell them to put your signature block on it. And this was the authorized signature block for the firm, right?

A. I suppose it was authorized. I think it's the one the firm used. I just don't...

Q. I'm not quibbling with you.

I'm just asking, though, if Lloyd & Mousilli, PLLC, is asking to withdraw as an attorney, there's no attorneys in Lloyd & Mousilli, PLLC to identify, right, other than you?

A. Me.

Q. You have your name?

A. Yes.

Q. And there's no other lawyer on here that we can identify as a lawyer for Lloyd & Mousilli, right?

A. I did this on behalf of the firm, yes.

Q. Yeah. And we know that Lloyd & Mousilli, PLLC has no members that are lawyers, right? It has a company and then it has an Inc. as its members.

Did you know that?

A. Well, we talked about that earlier.

Q. Yeah. So even at this time in August of 2024, they are running signature blocks with you as the lawyer under Lloyd & Mousilli, PLLC, with no other lawyers on there for the PLLC, right?

MS. FARRELL: Asked and answered.

THE WITNESS: I was -- yeah. I was the only lawyer on this case.

MS. FARRELL: Asked and answered.

THE COURT: It's sustained.

MR. KELLEY: I think I'm almost done. Will you give me one second, Judge?

Q. (BY MR. KELLEY) I want to make sure that I covered this. There was no incident where you actually saw Ms. Mousilli in an office with other employees and she's yelling at them. Is that true or is that false?

THE COURT: It's asked and answered. She said no.

MR. KELLEY: I'm sorry. I'll move on, Judge. I'll move on.

I think I'm done, Judge. I'm going to pass the witness, Judge.

THE COURT: Anything further on redirect?

MS. FARRELL: Yes. Very briefly.

REDIRECT EXAMINATION

BY MS. FARRELL:

Q. Did the remote model work for you?

A. Yes.

Q. Were you able to effectively serve clients working remotely?

A. Yes.

Q. Was the firm able to function effectively to work for you while you worked remotely?

MR. KELLEY: Objection, leading.

THE COURT: Sustained.

You have to go back to direct. I often fell into that trap, but, yeah.

Q. (BY MS. FARRELL) You understood that Lema's title was partner?

A. Correct.

Q. Did you believe that she -- did you -- did you know whether she had equity in the firm?

A. She told me she did not and she was a partner in name only. And that the firm belonged to Feras.

Q. Do you recall that conversation?

A. It started -- that was the phone call that we had over the fee dispute when she was explaining, because I was shocked that a partner could not advocate for a litigator to be paid for the hours they worked.

And she thoroughly explained to me why she could not.
MS. FARRELL: No more questions.
THE COURT: Anything further on recross?
MR. KELLEY: Yes, ma'am.
THE COURT: Okay. Proceed.

RECROSS-EXAMINATION

BY MR. KELLEY:
Q. She said that the model worked for you, but the model ultimately didn't work for you because you had multiple fee disputes, right, with this firm?
A. That has nothing to do with working from home.
Q. No. I agree with you.
A. I think the model works for me. I work from home now.
Q. Working from home worked for you, but working for Lloyd & Mousilli, the way they structured their pay, did not work for you; is that true? Because they, what -- several -- we have talked about two fee disputes. Were there more?
A. Potentially, but those were the two major ones.
Q. Two major ones.
And then it's -- but you've -- you're aware that law firms can structure some -- big law firms can have a managing partner that -- that makes all of the shots, right? Somebody might advocate for you, but

usually they have one guy called the managing partner and he makes all of the decisions ultimately?

A. Yes.

Q. And if he wants to be a dictator, he can be a dictator. That's the way it is, right?

A. Uh-huh.

Q. Are you familiar with that?

A. I imagine that's how some firms worked. I haven't worked for one of those.

MR. KELLEY: Pass the witness, Judge.

MS. FARRELL: Nothing further.

THE COURT: Ms. Revere, you may step down. May the witness be excused?

MR. KELLEY: Yes, ma'am, Your Honor.

MS. FARRELL: Yes.

(End of Elizabeth Revere's Testimony.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF HARRIS )

I, Michelle Shelton, Official Court Reporter in and for the 295th District Court, Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $__________ and was paid by ____________________.

WITNESS MY OFFICIAL HAND this the 14th day of June, 2026.

/s/Michelle Shelton
Michelle Shelton, Texas CSR 9312
Expiration Date: 2/28/27
Official Court Reporter
Harris County, Texas