**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **LEMA MOUSILLI,** *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL CASE NO. 4:25-cv-05642** |
| | § | ______________ |
| **DANIEL MCNARY "MAC" LECKRONE,** | § | **JURY DEMANDED** |
| *Defendant.* | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR LEAVE TO FILE SECOND AMENDED ANSWER AND COUNTERCLAIMS**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW, PLAINTIFF, LEMA MOUSILLI**, by and through her undersigned counsel, and files this *Response in Opposition to Defendant Daniel McNary "Mac" Leckrone's Motion for Leave to File Second Amended Answer and Counterclaims* (the "**Motion**"). In support thereof, Plaintiff respectfully shows the Court as follows:

## I. INTRODUCTION

1. Plaintiff is a partner in Lloyd & Mousilli, PLLC ("**L&M**") and served as its Litigation Partner for several years. (Dkt. 1 ¶ 7; Ex. E.) In mid-2024, after observing a pattern of unethical and wrongful conduct by her partner, Feras Mousilli, she stepped back from L&M's day-to-day practice and began practicing through her own firm. (Dkt. 1 ¶ 10.) The overwhelming majority of L&M's litigation clients chose to stay with her, including Well Cell Global, LLC, whose CEO is Scott Hepford ("**Mr. Hepford**"). (*Id.* ¶¶ 12, 14; Ex. D at LECK-001.) Plaintiff alleges that Feras Mousilli responded by suing her in L&M's name and that he and others, including Defendant, tried

to take her clients through false accusations about her. (Dkt. 1 ¶¶ 12–13; *see* Dkt. 22 ¶¶ 7–8.) On November 26, 2024, the day he learned that Well Cell had ended L&M's engagement, Defendant contacted Mr. Hepford and told him that Plaintiff had stolen hundreds of thousands of dollars from L&M. (Dkt. 1 ¶ 14.) In response to requests for admission, Defendant has admitted the surrounding facts: that he learned of the termination from someone then at L&M, contacted Mr. Hepford the same day without being asked, discussed Plaintiff on the calls, and the next day prepared an engagement agreement for his own company. (Ex. A, Resp. to RFA Nos. 32, 87, 128, 130, 149, 152.) Plaintiff texted Mr. Hepford that the accusation was a lie. Twenty-two months later, and two months after the amendment deadline, Defendant asks for leave to sue Plaintiff over the text messages she sent defending her reputation against that accusation.

2. Leave should be denied for two independent reasons. First, Defendant has not shown good cause under Rule 16(b)(4). He took part in the conversation the texts answered; Plaintiff's demand letter and Complaint told him the client had reported that conversation to her; and he never asked either of them what was said. Second, the amendment is futile. The defamation counts are time-barred on the face of Defendant's own pleading, the discovery rule does not save them, and the remaining counts either depend on the same publication or fail on Defendant's own chronology.

## II. BACKGROUND

### A. Plaintiff, Her Partnership in L&M, and Her Clients.

3. Plaintiff was a Litigation Partner of L&M from 2019, a title reflected on the firm's website and in its marketing materials and promotional videos. (Dkt. 1 ¶¶ 7–8.) She alleges that, over time, she observed Feras Mousilli engage in unethical and questionable behavior, received reports of his wrongful conduct, and objected to his improper treatment of attorneys and paralegals at the firm. (*Id.* ¶ 10.) In mid-2024, unwilling to continue associating with that conduct, she stepped back from

L&M's day-to-day practice and began practicing through her own firm. (*Id.*) The overwhelming majority of L&M's litigation clients chose to stay with her. (*Id.* ¶ 12.) Among them was Well Cell Global, LLC, whose CEO is Scott Hepford, together with its affiliate Well Cell Support LLC (collectively, "**Well Cell**"). (*Id.* ¶ 14; Ex. D at LECK-001, LECK-003.) Asked to admit that he knew Plaintiff was the client's lawyer, Defendant answered: "Admit that Defendant knew Plaintiff represented Scott Hepford related to litigation matters." (Ex. A, Resp. to RFA No. 43.)

4. Defendant's only connection to Well Cell came through L&M, where Plaintiff was the Litigation Partner. He pleads that he worked for L&M "on a contract basis." (Dkt. 21-1 ¶ 83.) In a sworn interrogatory answer, he stated: "I have been associated with Lloyd & Mousilli, PLLC as an independent contractor and contract attorney. My relationship with Lloyd & Mousilli, PLLC began on or about April 20, 2022. I have provided legal services to both the firm and to clients pursuant to an independent contractor arrangement." (Ex. I, Resp. to Interrog. No. 2.) His own consulting company, Planay LLC, never had a relationship of its own with Well Cell: he answered "Admit." to a request that Planay had no written engagement agreement with Well Cell Support LLC before November 27, 2024, and "Deny." to requests that Planay has received payment from either Well Cell entity. (Ex. A, Resp. to RFA Nos. 151, 155, 156.)

**B. Feras Mousilli's Response: The Petition and the Effort to Take Plaintiff's Clients.**

5. Plaintiff alleges that Feras Mousilli retaliated for her decision and the loss of those clients by suing her and attacking her reputation. (Dkt. 1 ¶ 12.) Feras Mousilli filed that suit in L&M's name in Harris County on October 18, 2024. Its petition alleged that Plaintiff "was previously contracted to provide legal services to Lloyd & Mousilli but was terminated on August 28, 2024"; that she worked under an "Independent Contractor Agreement"; and that she made an

"unauthorized withdrawal of $75,000" from an L&M account. (Dkt. 21-1 at 20 (Pet. ¶¶ 11–13).) The only withdrawal the petition alleges is $75,000. (*Id.* at 20–21 (Pet. ¶¶ 13, 20).)

6. The withdrawal the petition calls theft was a withdrawal by a partner from her own firm's account, and the $75,000 is now held in the registry of the state court. The petition's premise that Plaintiff was a mere contractor without any interest in the firm has been rejected. On April 1, 2026, a Harris County jury found that a general partnership existed between Plaintiff and Feras Mousilli known as Lloyd & Mousilli, PLLC, and the court accepted the verdict. (Ex. E.) The court later denied Feras Mousilli's motion for new trial. (Ex. H.)

7. Plaintiff further alleges that Feras Mousilli and others acting with him, including Defendant, tried to take her clients by spreading false information about her. (Dkt. 1 ¶ 13.) That effort began in August 2024, as Plaintiff has detailed in her pending Motion to Disqualify. (Dkt. 22 ¶¶ 7–8.) Defendant's November 26, 2024 call with Mr. Hepford, described below, was part of it. As Defendant's own documents show, he also pursued the client's business for his own company.

**C. November 26, 2024: Defendant Pursues the Client.**

8. Well Cell ended L&M's engagement after Feras Mousilli's widely publicized arrest, shortly before November 26, 2024. (Dkt. 1 ¶¶ 11, 14; Dkt. 21-1 ¶ 83.) Asked to admit he learned of that termination on November 26, Defendant answered: "Admit that I was aware of the Well Cell Termination on November 26, 2024." (Ex. A, Resp. to RFA No. 123.) He answered "Admit." to requests that he learned of it from a person then associated with L&M, and specifically from Megan Weiss. (*Id.*, Resp. to RFA Nos. 128, 130.)

9. That same day, Defendant wrote to Mr. Hepford and his assistant from mac@planay.pro, signing as "President" of his consulting company: "I was just informed about your recent message

to L&M. I would like to talk to you today if possible. Please call me." (Ex. D at LECK-002; Ex. A, Resp. to RFA Nos. 76–81.) He answered "Admit." to a request that Mr. Hepford had not asked him to make contact. (Ex. A, Resp. to RFA No. 149.)

10. Mr. Hepford called. Defendant answered "Admit." to requests that he took part in more than one call with Mr. Hepford that day, that the LECK-010 call times are stated in Pacific Time, and that the calls began at 10:02 a.m. (twenty minutes) and 10:57 a.m. (twenty-seven minutes). (Ex. A, Resp. to RFA Nos. 27, 96–98.) He answered "Admit." to requests that, during the calls, he spoke with Mr. Hepford about Plaintiff, that Mr. Hepford referred to the arrest of Feras Mousilli, and that Mr. Hepford questioned Defendant's continued association with L&M. (*Id.*, Resp. to RFA Nos. 32, 134, 135.)

11. Plaintiff alleges that, in the first call, Defendant told Mr. Hepford that Plaintiff had stolen hundreds of thousands of dollars from L&M, and that in a later call he put the figure at $75,000. (Dkt. 1 ¶ 14.) Asked to admit that he referred during the calls to the lawsuit filed against Plaintiff in L&M's name, Defendant answered: "Admit that L&M's allegation(s) against Plaintiff was/were mentioned." (Ex. A, Resp. to RFA No. 40.) He answered "Deny." to requests that he used the word "stole" or stated that Plaintiff stole money. (*Id.*, Resp. to RFA Nos. 34–35.) His proposed pleading now says that he told Mr. Hepford only that Plaintiff "had been accused of taking money from L&M," based on the petition. (Dkt. 21-1 ¶¶ 70–73.) Plaintiff disputes that account, and the petition Defendant relies on never alleged that Plaintiff took hundreds of thousands of dollars. *See* Part II.B.

**D. Plaintiff's Messages to Her Client.**

12. On November 26, 2024, while the calls were under way, Plaintiff sent Mr. Hepford the text messages produced as MOU0003 and MOU0004. (Ex. C.)[1] The messages deny, point by point, the accusations in the petition Feras Mousilli filed in L&M's name, which Defendant admits came up in the calls. (Ex. A, Resp. to RFA No. 40.) To the claim that she had been terminated, Plaintiff wrote "I wasn't fired" and "I quit." To the claim that she was merely a contractor, she wrote "I am a partner" and pointed to the firm's website, her emails, its marketing materials, and a video, the same evidence pleaded in her Complaint. (*See* Dkt. 1 ¶ 8.) She also responded to the accusation about money. (Ex. C.) The remaining messages, which Defendant quotes selectively (Dkt. 21-1 ¶ 89), are Plaintiff's opinion, offered to her own client, about a lawyer who was then making those accusations to that client.

**E. November 27 to 30, 2024: Defendant's Engagement Agreement.**

13. Defendant pleads that, after the calls, "it was decided" he would send Mr. Hepford an engagement letter "for Mr. Hepford's review and consideration." (Dkt. 21-1 ¶ 86.) He answered "Admit." to requests that the resulting agreement, prepared by him for Planay LLC, bears the date November 27, 2024; that its scope includes "general legal matters"; and that he transmitted it to Mr. Hepford on November 30, 2024. (Ex. A, Resp. to RFA Nos. 83, 87, 90, 150, 152; Ex. D.) Asked whether he expected to benefit financially if the agreement was signed, he answered: "Admit that I would have been paid for services requested and completed under the contract." (Ex. A, Resp. to RFA No. 154.) Mr. Hepford did not sign it. Defendant pleads that he "was not given a reason at the time." (Dkt. 21-1 ¶ 87.)

[1] MOU0003 bears the time stamp 12:04 PM. Plaintiff resides in Houston. (Dkt. 1 ¶ 5.) In Central Time, 12:04 p.m. is two minutes after the first call began at 10:02 a.m. Pacific Time. (Ex. A, Resp. to RFA Nos. 96–97.)

**F. This Litigation.**

14. Defendant admits receiving Plaintiff's pre-suit demand letter on November 24, 2025. (Dkt. 21-1 ¶ 29.) Plaintiff sued on November 23, 2025, alleging that Defendant made the challenged statements to the representative of a client who had chosen to stay with Plaintiff. (Dkt. 1 ¶ 14.) Defendant answered on March 9, 2026, without a counterclaim. (Dkt. 10.) The Scheduling Order set July 31, 2026 for amendments to pleadings; September 1 and October 1, 2026 for expert designations; January 15, 2027 for the close of discovery; and February 16, 2027 for motions. (Dkt. 15 ¶¶ 1–4.)

15. Defendant served his first written discovery on Plaintiff on July 24, 2026, seven days before the amendment deadline, and a second set on September 18, 2026. On July 31, he filed a First Amended Answer without leave or consent, adding a public-figure defense and a declaratory counterclaim but no tort counterclaim. (Dkt. 16.) Plaintiff produced MOU0003 and MOU0004 on August 25, 2026.[2] (Dkt. 21 ¶ 22.)

16. Defendant filed the Motion on September 29, 2026. On October 14, he objected to producing Planay's formation documents, its agreements with the Well Cell entities, and its invoices and payment records. (Ex. B, Resp. to RFP Nos. 31–36.) His response to Request No. 31 states: "Formation documents and other documents related to Planay, LLC have no relationship to the claims or defenses made the basis of this lawsuit." (*Id.* at 7.)

**Summary of Key Dates**

| **Date** | **Event** | **Record** |
|---|---|---|
| Oct. 18, 2024 | Feras Mousilli sues Plaintiff in L&M's name, alleging she was a terminated contractor who took $75,000. | Dkt. 21-1 at 20 |

[2]The proposed pleading elsewhere gives the production date as August 26, 2026. (Dkt. 21-1 ¶ 88; *but see id.* ¶ 91.) The one-day difference is immaterial.

| Date | Event | Record |
|---|---|---|
| Nov. 26, 2024 | Defendant learns from L&M that Well Cell ended L&M's engagement; emails Mr. Hepford from mac@planay.pro asking him to call. | Ex. A, RFA 123, 128, 130, 76–81, 149; Ex. D |
| Nov. 26, 2024 | Two calls, 10:02 and 10:57 a.m. Pacific; Plaintiff's messages to Mr. Hepford. | Ex. A, RFA 27, 96–98; Ex. C |
| Nov. 27–30, 2024 | Defendant prepares and sends Planay engagement agreement; never signed. | Ex. A, RFA 83, 87, 90; Ex. D; Dkt. 21-1 ¶ 87 |
| Nov. 24, 2025 | Defendant receives Plaintiff's demand letter. | Dkt. 21-1 ¶ 29 |
| Nov. 26, 2025 | One-year limitations period on defamation expires. | § 16.002(a) |
| July 31, 2026 | Amendment deadline; Defendant files Dkt. 16 without leave. | Dkt. 15 ¶ 1; Dkt. 16 |
| Sept. 29, 2026 | Defendant files this Motion. | Dkt. 21 |

## III. GOVERNING STANDARD

17. Defendant agrees that, because the amendment deadline has passed, he must first satisfy Rule 16(b)(4), under which the Court weighs (1) the explanation for the failure to move timely, (2) the importance of the amendment, (3) potential prejudice, and (4) the availability of a continuance to cure that prejudice; only if he does so does the Court reach Rule 15(a)(2). (Dkt. 21 ¶¶ 18–21.) Rule 16(b)(4) permits a schedule to be modified only for good cause and with the judge's consent. Defendant also agrees that futility asks whether the proposed pleading would withstand a motion to dismiss. (Dkt. 21 ¶¶ 39, 41.) That is the Fifth Circuit standard. Leave to amend "is in no way automatic"; an amendment is futile if it would fail to survive a Rule 12(b)(6) motion; and the proposed pleading is reviewed under "the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378–79 (5th Cir. 2014) (quoting *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 873 (5th Cir. 2000)).

18. That standard applies to every item of new matter in the proposed pleading that was not in Defendant's Original Answer (Dkt. 10). The Motion treats Dkt. 16 as "the live, operative pleading" (Dkt. 21 ¶ 5), but Dkt. 16 was filed without leave or consent and is the subject of Plaintiff's pending Motion to Strike (Dkt. 26). "The failure to obtain leave results in an amended complaint having no legal effect." *United States ex rel. Mathews v. HealthSouth Corp.*, 332 F.3d 293, 296 (5th Cir. 2003). The Motion offers no good-cause showing for the Ninth Defense (Dkt. 21-1 ¶ 53) or the declaratory counterclaim (*id.* ¶¶ 54–80). Each rests on facts Defendant possessed when he answered in March 2026: his own presence in Oregon during the calls (*id.* ¶¶ 62, 74–75) and Plaintiff's candidacies for judicial office, which he describes as matters of public record (*id.* ¶ 53 & n.1). If the Court grants Dkt. 26, leave as to those items should be denied for want of any showing at all.

## IV. ARGUMENT AND AUTHORITIES

### A. Defendant Has Not Shown Good Cause Under Rule 16(b)(4).

#### 1. Defendant's explanation does not show diligence.

19. Defendant's only explanation is that he "could not have known about the statements until they were produced by Plaintiff on August 25, 2026." (Dkt. 21 ¶ 22.) The record does not support it. Defendant took part in the conversation the messages answered, knowing Plaintiff was Well Cell's lawyer and that Mr. Hepford was pressing him about L&M. *See* Part II.C. When Mr. Hepford did not sign his engagement agreement, Defendant "was not given a reason at the time" (Dkt. 21-1 ¶ 87), and he does not allege that he ever asked a client he says he had represented "for years" (*id.* ¶ 85).

20. He was then told where to look. On November 24, 2025, he received Plaintiff's demand letter (Dkt. 21-1 ¶ 29), and in February 2026 he was served with a Complaint alleging that he made

the challenged statements to Plaintiff's client in the very calls at issue, a client who had chosen to remain with Plaintiff (Dkt. 1 ¶ 14). From those documents Defendant knew that Mr. Hepford had communicated with Plaintiff about his calls with Defendant. Defendant's own May 15, 2026 disclosures listed Mr. Hepford and his mobile number. (Ex. A, Resp. to RFA No. 101.) Plaintiff's June 9, 2026 supplemental disclosures identified Mr. Hepford's "subsequent business dealings with Plaintiff and with Defendant Leckrone / Planay LLC" as a subject of his knowledge. (Ex. F at 3.) Defendant had more than seven weeks after that disclosure, and more than eight months after the demand letter, to ask Mr. Hepford or Plaintiff what had passed between them. Before that, Defendant had delayed his own appearance in this case for more than three months: he did not respond to a request to waive service, and Plaintiff had to obtain an order authorizing substituted service. (Dkt. 7 ¶¶ 2, 5; Dkt. 9.) He did not serve written discovery on Plaintiff until July 24, 2026, seven days before the deadline. On the deadline day he filed an amended pleading, without leave, that added a defense and a counterclaim but said nothing about any messages. (Dkt. 16.)

21. The first factor asks for the explanation for the failure to move timely. (Dkt. 21 ¶ 20.) Defendant's explanation reduces to the fact that he did not look until July. That describes the absence of diligence; it does not excuse it. Even under the more lenient Rule 15(a) standard, the movant "bears the burden of showing that delay was due to oversight, inadvertence or excusable neglect," and leave may be denied where the delay "could have been avoided by due diligence." *Parish v. Frazier*, 195 F.3d 761, 763 (5th Cir. 1999). Defendant offers no such showing.

**2. The amendment is not important on this record.**

22. Defendant argues the amendment is important because the counterclaims are compulsory and denial would leave him "without recourse." (Dkt. 21 ¶¶ 23–24, 32.) A futile claim (Part IV.B) carries no importance, and the compulsory character of a claim does not revive it. Texas law

already prescribes how much latitude a time-barred counterclaim arising from the same transaction receives: it may be filed even though it would be barred as a separate action, but only if filed not later than the thirtieth day after the date on which the party's answer is required. Tex. Civ. Prac. & Rem. Code § 16.069(a)–(b). Defendant's answer was required in March 2026 (*see* Dkt. 9; Dkt. 10), so that window closed in April 2026, more than five months before he filed the Motion. Defendant does not invoke section 16.069, and it does not help him.

23. Defendant's own discovery positions confirm that the amendment is not important to him. His proposed counterclaims seek "lost revenue and profits" and "lost profits and business opportunities" arising from the loss of his professional relationship with Mr. Hepford. (Dkt. 21-1 ¶¶ 102, 113, 122.) Fifteen days after filing the Motion, he objected that Plaintiff's request for invoices, billing statements, and payment records reflecting amounts billed to or received from the Well Cell entities is "not reasonably tailored to relate to the claims and defenses made the subject of this lawsuit" (Ex. B, Resp. to RFP No. 35, at 9), and that documents related to Planay "have no relationship to the claims or defenses made the basis of this lawsuit" (*id.*, Resp. to RFP No. 31, at 7). Those objections are subject to the certification requirements of Rule 26(g). Defendant cannot tell the Court that claims for lost Planay revenue are important enough to modify the Scheduling Order and then tell Plaintiff, two weeks later, that Planay's revenue records are unrelated to the case.

**3. Plaintiff would be prejudiced.**

24. The new claims would arrive with three months of discovery remaining. (Dkt. 15 ¶ 3.) Both expert deadlines have passed. (*Id.* ¶¶ 2a–2b.) Defendant, who would bear the burden of proof on his lost-profit theories, has designated no expert on damages. (Ex. G.) The Court would therefore face either lost-profit claims without expert support or a request to reopen designations. Plaintiff

would have to take discovery on Planay's revenue, its prior work for the Well Cell entities, Mr. Hepford's reasons for not engaging Defendant, and Defendant's claimed emotional distress, while Defendant withholds the Planay and Well Cell records on which those claims depend. (Ex. B, Resp. to RFP Nos. 31–36.)

25. Defendant says no continuance is needed. (Dkt. 21 ¶ 26.) A continuance would not cure the prejudice described above; it would compound it by delaying the June 28, 2027 trial setting (Dkt. 15 ¶ 7) on claims Plaintiff filed in 2025 to accommodate claims Defendant could have investigated in 2024.

**B. The Proposed Counterclaims Are Futile.**

**1. The defamation and defamation per se counts are time-barred.**

26. Federal courts sitting in diversity apply state statutes of limitations. *Citigroup Inc. v. Fed. Ins. Co.*, 649 F.3d 367, 373 (5th Cir. 2011). Texas law, which the Motion also applies (Dkt. 21 ¶¶ 42–53), imposes a one-year limitations period on defamation claims. Tex. Civ. Prac. & Rem. Code § 16.002(a); *Newsom v. Brod*, 89 S.W.3d 732, 736 (Tex. App.—Houston [1st Dist.] 2002, no pet.). A defamation claim generally accrues when the matter is published. *Newsom*, 89 S.W.3d at 736. More broadly, a cause of action accrues when a wrongful act causes some legal injury, "even if the fact of injury is not discovered until later." *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996); *accord Childs v. Haussecker*, 974 S.W.2d 31, 36 (Tex. 1998). Defendant pleads that the statements were made on November 26, 2024. (Dkt. 21 ¶¶ 51–52.) The limitations period expired on November 26, 2025, ten months before the Motion.

27. Defendant's only avenue is the discovery rule. (Dkt. 21 ¶¶ 42–47, 51–52.) Whether the discovery rule applies "is a question of law." *Steel v. Rhone Poulenc, Inc.*, 962 S.W.2d 613, 618 (Tex. App.—Houston [1st Dist.] 1997), *aff'd*, 997 S.W.2d 217 (Tex. 1999). The Supreme Court

of Texas describes it as "a very limited exception" that applies only when an injury is both inherently undiscoverable and objectively verifiable. *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 279 (Tex. 2004); *see also Li v. Univ. of Tex. Health Sci. Ctr.*, 984 S.W.2d 647, 651 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). Defendant contends the statements were inherently undiscoverable because they were made as part of "a private conversation." (Dkt. 21 ¶ 11; *see id.* ¶ 46.) That argument confuses what Defendant happened not to know with what was discoverable. "Inherently undiscoverable" does not "mean merely that a particular plaintiff did not discover his injury within the prescribed period of limitations"; an injury qualifies only "if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence." *S.V.*, 933 S.W.2d at 7. The Fifth Circuit applies the rule the same way: it is "a narrow exception reserved for exceptional cases," and the inquiry is "not case-specific: the question is whether the type of injury alleged is the kind that could ordinarily be discovered through the exercise of reasonable diligence." *Quiroz v. Hernandez*, 167 F.4th 254, 262 (5th Cir. 2026) (internal quotation marks and citations omitted).

28. Statements made to a lawyer's longtime client, on the day the lawyer was on the telephone with that client discussing the very subject of the statements, are not by nature unlikely to be discovered. They are discoverable by asking the client. Defendant had every reason to ask. The client pressed him during the calls about his association with L&M. (Ex. A, Resp. to RFA Nos. 134, 135.) The client then did not sign the engagement agreement Defendant sent. (Dkt. 21-1 ¶ 87.) And the client was, by Defendant's own account, a man he had represented for years. (*Id.* ¶ 85.) Defendant's theory would extend the discovery rule to every defamatory statement not made in public, converting "a very limited exception" into the general rule. *Schneider*, 147 S.W.3d at 279.

29. Even when the discovery rule applies to a defamation claim, it defers accrual only until the claimant "discovers or, through the exercise of reasonable care and diligence, should discover the nature of the injury." *Newsom*, 89 S.W.3d at 736. The claimant "need not know the specific nature of each wrongful act that may have caused the injury." *Id.* (citing *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 749 (Tex. 1999)). Accrual occurs upon notice of injury, even if the claimant does not yet know the full extent of damages. *Schneider*, 147 S.W.3d at 279. And once the claimant has information that would prompt a reasonable person to inquire, the duty of inquiry attaches. *Li*, 984 S.W.2d at 652. Limitations "begin to run when the fact of the injury is known, not when the alleged wrongdoers are identified." *Steel*, 962 S.W.2d at 618. Thus a plaintiff who knew of his injury when it occurred, but learned of its cause only later, could not invoke the discovery rule; the burden was on him to determine whether to sue those who may have been responsible. *Id.* at 619 (describing *Seibert v. Gen. Motors Corp.*, 853 S.W.2d 773, 776–77 (Tex. App.—Houston [14th Dist.] 1993, no writ)). In *Newsom*, the plaintiff knew he had been fired following complaints but claimed he did not learn who complained, or what was said, until later. 89 S.W.3d at 736–37. The court held the claim barred because the plaintiff knew of his injury when he was fired and "should have used more diligence in pursuing his claims against those parties who may have contributed to his injury." *Id.* at 737.

30. Defendant stands in a weaker position than the plaintiff in *Newsom*. The injury he pleads is the loss of Mr. Hepford's business. (Dkt. 21-1 ¶¶ 102, 112, 121.) He knew of that loss when Mr. Hepford did not engage him (*id.* ¶ 87), and he knew Plaintiff was the client's lawyer (Ex. A, Resp. to RFA No. 43). He does not allege that he learned of the lost engagement later than September 29, 2025, one year before he moved for leave, and nothing in his pleading suggests that he did. Because Defendant measures futility by the motion-to-dismiss standard (Dkt. 21 ¶¶ 39, 41), the

question is whether his own allegations establish the bar. They do. When they do, leave to amend is properly denied as futile. *Crostley v. Lamar County*, 717 F.3d 410, 421–22 (5th Cir. 2013) (affirming denial of leave to amend as futile because the statute of limitations barred the proposed claim).

**2. The business disparagement count is a defamation count and is barred for the same reason.**

31. Defendant invokes the two-year statute for business disparagement. (Dkt. 21 ¶ 48.) A claimant may not escape the one-year defamation period by relabeling a claim for personal reputational harm. *Newsom*, 89 S.W.3d at 734–35. The court examines the factual allegations and the type of damages alleged; if the damages are "primarily personal and general," such as "injury to personal reputation, humiliation, or mental anguish," the claim sounds in defamation "even though incidental or consequential professional losses are also pleaded and proved." *Id.* at 734. Business disparagement exists "to protect the economic interests of the injured party against pecuniary loss," requires special damages in the form of loss that "has been realized or liquidated," and requires that the communication "play a substantial part in inducing others not to deal with a plaintiff." *Id.* at 735.

32. Defendant's disparagement count complains that the messages derided his ability to practice law, attacked his ethics, and questioned his experience. (Dkt. 21-1 ¶¶ 109–110.) The defamation count it incorporates seeks damages for "a loss of standing in the community" and "considerable mental anguish." (*Id.* ¶¶ 103, 106.) The only economic relationship the pleading identifies is with Well Cell, and the record defeats the special-damages element as to that relationship. Defendant's only connection to Well Cell came through L&M, as its contract attorney, and Well Cell ended L&M's engagement before the messages were sent. *See* Part II.A, C; Dkt. 21-1 ¶ 83. Planay never had an engagement with Well Cell and was never paid by it. (Ex.

A, Resp. to RFA Nos. 151, 155, 156.) What existed on November 26, 2024 was a proposal, which Defendant prepared and sent after the messages. (Dkt. 21-1 ¶ 86; Ex. A, Resp. to RFA Nos. 83, 87.) The loss of a prospect that Defendant was still pursuing after the challenged statements, attributed to them only "upon information and belief" (Dkt. 21-1 ¶ 112), is not loss "realized or liquidated." *Newsom*, 89 S.W.3d at 735. The count is governed by the one-year period and is barred for the reasons set out above.

**3. The interference and emotional distress counts rest on the same publication and fail on causation.**

33. The interference count depends on Defendant's allegation that the messages were "independently tortious as defamation, defamation per se, and business disparagement." (Dkt. 21-1 ¶ 120.) If those claims are barred or fail, nothing independently tortious remains to support it. The emotional distress count fails for a separate reason. Intentional infliction of emotional distress is a "gap-filler" tort "never intended to supplant or duplicate existing statutory or common-law remedies." *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 (Tex. 2005). It "has no application when the 'actor intends to invade some other legally protected interest,' even if emotional distress results," and "[w]here the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available." *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004) (citation omitted). The court identified defamation as such a tort. *Id.* Defendant's emotional distress count seeks redress for the same "libelous statements" (Dkt. 21-1 ¶ 125) and the same "humiliation, anxiety, and mental anguish" (*id.* ¶ 127) as his defamation count (*id.* ¶ 103). Its gravamen is defamation. That the defamation claim is time-barred does not open a gap: the tort was never intended "to supplant existing common law remedies." *Hoffmann-La Roche*, 144 S.W.3d at 447.

34. Causation fails on the face of the pleading. The interference and disparagement counts allege that the messages caused Mr. Hepford not to engage Defendant. (Dkt. 21-1 ¶¶ 112, 121.) The messages were sent on November 26, 2024. (*Id.* ¶ 88.) By Defendant's own account, it was after the calls that day that he and Mr. Hepford agreed he would send an engagement letter for Mr. Hepford's "review and consideration," and he alleges that "[a]t the conclusion of" those calls there was "a reasonable probability" Mr. Hepford would engage him. (*Id.* ¶¶ 86, 117.) He then prepared an agreement dated November 27, 2024 and sent it on November 30, 2024. (Ex. A, Resp. to RFA Nos. 83, 87, 90.) On Defendant's own chronology, the messages preceded, rather than prevented, the next step in his solicitation. His allegations that the messages caused the result he complains of are made "[u]pon information and belief." (Dkt. 21-1 ¶¶ 102, 112, 119, 121.)

**4. The messages are not actionable as pleaded.**

35. Whether words are capable of the defamatory meaning a claimant attributes to them is a question of law for the Court. *Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.). So is whether a statement is an actionable assertion of fact, which is determined from "the entire context in which the statement was made." *Palestine Herald-Press Co. v. Zimmer*, 257 S.W.3d 504, 509 (Tex. App.—Tyler 2008, pet. denied). The Court can therefore decide these questions now, on the face of the proposed pleading and the full exchange it relies on. (Dkt. 21-1 ¶¶ 88–89; Ex. C.)

36. To be actionable, a statement "must expressly or impliedly assert facts that are objectively verifiable." *Zimmer*, 257 S.W.3d at 509. A characterization that "rests solely in the eye of the beholder" is not such a statement. *Id.* at 512. Applying the same test, the court in *Whitelock v. Stewart* recognized that statements calling the plaintiffs "total idiots" and "nothing but liars and a bunch of frauds" were opinions about their character that "may not have been objectively

verifiable." 661 S.W.3d 583, 599–600 (Tex. App.—El Paso 2023, pet. denied). "You don't want him," "can't think clearly," "believes whatever he is told," and "idiot" (Dkt. 21-1 ¶ 89) assert no verifiable fact. Defendant's own Third Affirmative Defense describes the category: "protected opinion, rhetorical hyperbole, or statements not capable of being proven false." (*Id.* ¶ 47.)

37. Defendant's per se theory fails for a related reason. He pleads that the messages are defamatory per se because they "adversely reflect on Mr. Leckrone's business, trade, or profession," so that his damages are presumed. (Dkt. 21-1 ¶¶ 99, 104.) Name-calling of this sort is not defamatory per se. In *Moore*, the court held that calling a newly hired prosecutor a "crook" was "a general disparagement" that imputed no specific crime and did not injure his profession; it was "mere 'name calling.'" 166 S.W.3d at 386. The court relied on authority holding that words such as "liar" and "crook" are not actionable per se, *id.* at 384, and that such words, "taken by themselves and without explanation," do not "affect [the plaintiff] injuriously in his office, profession, or occupation," *id.* at 386 (quoting *Billington v. Houston Fire & Cas. Ins. Co.*, 226 S.W.2d 494, 496 (Tex. Civ. App.—Fort Worth 1950, no writ)). Words that become defamatory only through context are actionable, if at all, per quod, and then the claimant must plead and prove special damages. *Id.* at 386–87. Defendant's only special damages are the lost Planay engagement, attributed to the messages "upon information and belief" (Dkt. 21-1 ¶¶ 102, 112), a prospect that, as shown in Part IV.B.2, produced no prior engagement and no payment and was still being pursued after the messages were sent.

38. Plaintiff recognizes that a statement that someone is "a liar" can imply knowledge of facts "that lead to the conclusion that [he] told an untruth." *Zimmer*, 257 S.W.3d at 509. Here, however, the implied fact is identified on the face of the exchange. "He's lying" and "That is a lie" are followed immediately by "I wasn't fired," "I quit," and "I am a partner." (Ex. C.) The only

verifiable fact those messages imply is that the accusations Defendant was making about Plaintiff were false. That is the question Plaintiff's own claims present, and its central component, whether Plaintiff was a partner, has been decided by a jury in her favor. (Ex. E; Ex. H.) A counterclaim on that implied fact would not add a new controversy; it would try Plaintiff's case a second time with the parties reversed.

39. The contrast with Plaintiff's claim is instructive. A statement that "unambiguously and falsely imputes criminal conduct" is defamatory per se. *Moore*, 166 S.W.3d at 386 (quoting *Gray v. HEB Food Store No. 4*, 941 S.W.2d 327, 329 (Tex. App.—Corpus Christi 1997, writ denied)). *Whitelock* drew the same line: the court held that specific accusations, such as that the plaintiffs had starved horses in their care and had faced animal cruelty charges, "crossed the line between opinion and fact and were objectively-verifiable," while the name-calling did not. 661 S.W.3d at 599–600. Plaintiff alleges that Defendant told her client that she stole hundreds of thousands of dollars. (Dkt. 1 ¶ 14.) Plaintiff told her client that the accusation was a lie. The law treats those two statements differently, and Defendant's proposed counterclaims do not.

### C. The Rule 15(a)(2) Factors Independently Require Denial.

40. Even if Defendant had satisfied Rule 16(b)(4), the same record establishes undue delay, prejudice, and futility, three of the Rule 15(a)(2) factors Defendant identifies. (Dkt. 21 ¶ 16.)

## V. PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff Lema Mousilli respectfully requests that the Court deny Defendant's Motion for Leave to File Second Amended Answer and Counterclaims (Dkt. 21) in its entirety and grant Plaintiff such other and further relief to which she may show herself justly entitled.

DATE: October 20, 2026 Respectfully submitted,

*/s/ Lloyd E. Kelley*
LLOYD E. KELLEY
Attorney-in-charge
Texas State Bar No. 11203180
SDTX Federal ID No. 13497
**THE KELLEY LAW FIRM**
2726 Bissonnet Ste 240 PMB 12
Houston, Texas 77005
Telephone: 281-492-7766
Telecopier: 281-652-5973
*kelley@lloydekelley.com*

**ATTORNEYS FOR PLAINTIFF**

**OF COUNSEL:**

Lema Mousilli
Texas State Bar No. 24056016
SDTX Federal ID No. 1358290
**MOUSILLI LAW, PLLC**
11807 Westheimer Road
Suite 550, PMB 624
Houston, TX 77077
Tel: (281) 305-9313
*lema@mousillilaw.com*
*service@mousillilaw.com*

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2026, a true and correct copy of the foregoing document, together with its exhibits and form order, was served on all counsel of record through the Court's CM/ECF system in accordance with the Federal Rules of Civil Procedure and this District's electronic filing rules.

/s/ Lloyd E. Kelley
Lloyd E. Kelley